Page number 23-1761. Andrew Hanson et al. Appellants v. District of Columbia and Pamela A. Smith. Mr. Wanger for the appellants and Mr. Patak for the appellees. Good morning, your honors. It may please the court. My name is Edward Wanger and I represent the plaintiffs' appellants in this matter. With the court's permission, I'd like to reserve four minutes for rebuttal. The case before this court begins and ends with Heller as clarified and resuscitated by Broome. In Heller, when the Supreme Court struck the district's categorical ban on operable pistols, it held that the handgun ban amounts to a prohibition of an entire class of arms that is overwhelmingly chosen by the American society for that lawful purpose. Whatever the reason they are the most popular weapon, a complete prohibition of their use is invalid under the Second Amendment. This case before the court involves an arm. Standard magazines that hold more than ten rounds that this court ten years ago in Heller, too, observed were common. In fact, every circuit court to address this issue concluded that plus ten magazines are common under any conceivable definition of that word. Are we bound by that determination in Heller, too? No, your honor, but I don't believe on this particular issue. Why wouldn't you be bound by that? If the court decides that… No, no, I'm not asking you to say what I want to hear. I would have no objection. I'm asking you analytically, while the Supreme Court certainly changed the intermediate scrutiny aspect of that decision, common use is an issue that remains under Bruin. And we found there on the record that there was common use of large-capacity weapons, large-capacity magazines. So does that… I'm just asking you to tell me whether… Under the law on the circuit, your honor, I would say that it's binding on this court. So we don't have to wrestle with what on earth common use means, which many other courts have been dealing with. That's correct, your honor. There's no reason to revisit that, and under that, that really… Does it also answer the question of whether it's an arm? Absolutely it does, your honor. I think so. And to the extent… I think so. We didn't break that question out. I'm trying to figure out whether it's kind of inherent in common use, but I could be wrong. I don't think it's inherent in common use, your honor, but I think… But common use is what? Well, common use is self-defense. There's no reason to find it's common use if you don't think it's an arm. That's exactly right, your honor. I think analytically, and I think just implication. Those aspects of Heller 2 are still binding on this. Absolutely, your honor. Analytical questions about usage, and those are binding. It's just intermediate scrutiny stuff that we… That is correct, your honor. The only thing that was cut off under Heller 2 was the idea that you can means and scrutiny your way out of a fundamental right. So as I was saying, and as Judge Milleth has recognized, these magazines are astoundingly common. I just said a question. I'm going to say whether I recognize the question. No problem, your honor. The test is this, though. If something is a bearable arm, which it is, it's presumptively protected by the Second Amendment from any flat prohibition. The only way that the government can overcome that presumption is by showing that the arm is both unusual and dangerous. Can I ask about another thing? It sounds like you have both, as I read your plate, you have both a facial and as-applied challenge. Is that correct, or are we really here focused for the PI purposes, or are we just focused on the as-applied challenge? No, your honor. I think that the court is well within its rights to reach and say that it's a facial matter. Did you argue to the district court that you wanted a preliminary injunction based on the facial and as-applied challenge? I did, your honor. Focus on the as-applied. I think that the focus was primarily on the as-applied, and we didn't forfeit away the argument that this law is facially unconstitutional under the Second Amendment. But my understanding also is that you agree that there's some level of magazine that could be prohibited. It's not in common use for self-defense. If that magazine is not in common use for lawful purpose, then— —it would range from 6 or 8 to 18. I think the problem— And you said it's within the standard issue range. Would 30— 30-round magazines are common for rifles, your honor. I'd say that for handguns, for the best-selling handguns— Handguns are sort of— That is the focus of this, but we want to make— —established territory. Absolutely, but we want to make sure that we also recognize that 30-round magazines are in common use for rifles. We don't have anything in that record for us. No, no, no, but the best— Okay, so we don't have anything in that for the PI. Okay, so for the purposes of the handguns, though, some of the best-selling handguns—we referenced these in our briefs and put this before the district court— is that of the top five selling self-defense pistols, the Sig Sauer P320, the second best-selling pistol, that'll come standard anywhere from a 17 to a 23-round magazine. So if you're looking at that range, the focus really is, and the test is, are these commonly chosen by the American people for self-defense purposes? For a facial challenge, you have to show that there's no application for this law that could be constitutional. Right. But if there is—and we're doing this through a preliminary injunction lens, so it's even, you know, more of a burden on you than it may be at the merit stage. My suggestion to that is, if you haven't argued here and you haven't created a record for PI purposes, not talking about what you can do when you get to the merits, if you haven't shown that 25 or higher is common use for self-defense and meets all the other criteria for protection under the Second Amendment, then your facial claim fails. You have the applied one. That's correct, Your Honor. But it's only up to 18 for your clients. Correct, Your Honor. So facial is off the table for PI purposes. Just for PI. The likelihood of success. So we really are talking about an as-applied challenge. That's what this record has been for this preliminary injunction. Absolutely, Your Honor. And we acknowledge that. That range is kind of 6 to 8. I think the highest I saw for your clients was 17, but I think you mentioned things come out with 18. When we say 6 to 18 is the range for common use, and you say for self-defense, at least common use for standard issue is, let's say, 6 to 18. Is that correct? I'm not sure if I caught that question. You said 6 to 8? 18. 6 to 18. Okay, so I'm not sure yet, because that would be a different story. As-applied challenge. What your clients have here. The highest I have them in the record is 17, but we could say 18, because I thought you put evidence in about some standard issues at 18. If the inquiry is limited only to these clients, the record suggests that they want to- Less than the as-applied challenge. Correct. For the as-applied challenge, their only focus, the highest that any of my clients possess, they want to get in the district, is 18. I want to make very clear, though- You're telling me 18. Well, yeah, 17. We want to make very clear. 17 is in the record, Your Honor. 17 in the magazine, or 18 including the one in the- 17 in the magazine, plus one additional in the chamber. That one you can have in the chamber otherwise. Right. We're dealing with 11- So 17, I think, is, for purposes of these clients, 17 is the number. For purposes of the Second Amendment inquiry, common use is the watchword, and we would submit the common use goes, roughly speaking, to about 23 based on the record before the court. If this were a case of 50 round magazines- Again, I thought we got to the point where, for the PI purposes, we're looking at- I'm agreeing. No, no, no, I'm agreeing. For PI purposes, yes, I agree with you, Your Honor. But in your colloquy in the district court, I recall you said 20. You would have a hard time defending more than 20 for a handgun and 30 for a rifle. Isn't that correct? I believe it is, Your Honor. Like I said, whenever we actually looked in the record and we put into the statistics that are based on the sale of pistols- That's also about the record of the- That is correct, Your Honor. Yes, the colloquy at the district court was focused on anything above 20 for pistols. For pistols, it would likely be harder to justify. So I think anything more than that, you're pimping away. I'm not willing to suggest, Your Honor, that we waive that. I think that that was perhaps one of the arguments. We would like to clarify that a little bit if it were to go back down for any additional evidence. I'm just talking about for the PI stage. Yeah. So for the PI stage, like I said, our clients have handguns with magazines up to 17, and it was argued that anything over 20 would likely be a little bit harder to argue. But as applied, it's going to stop at 17. Correct. Okay. All right. So back to what I was saying. The test is this, though. The only way that the government can overcome the presumption is by showing that the arm is both unusual and dangerous. And Bruin makes crystal clear that it's the government's burden at this step. The district court got it right, and I believe that this court will also, when it found that magazines are bearable arms under Bruin's definition, they plainly facilitate self-defense. On this record, there are no fewer than 100 million, perhaps as high as 500 million, higher capacity magazines that are in circulation in America today. Is that the – That's the English declaration. Sorry. What I'm asking is, are you talking about ones in sort of the 6 to 17 range? No, no, no. These are the magazines that exceed the district's – And if they incirculate, what does it mean, incirculation? Does that include purchases by the military and law enforcement? No, these are civilian purchases, Your Honor. Okay. Are these law-abiding civilian purchases or non-law-abiding civilian purchases? With the caveat that it's the district's burden to prove that these are not – You want a preliminary injunction – That's true, Your Honor. That changes the status quo and will inflict reparable harm on the district. I know you have your reparable harm. I'm not overlooking that. But when you want to change the status quo preliminary injunction, and as applied, and it will cause irreparable harm to the government and the public interest, you've got some work to do. And so when you throw out statistics for your as-applied challenge, it would help to have some more particularity, because if that number you just threw out includes ones over 17 or even over 20, if it includes rifle magazines, which aren't reforged for the PI – there's no record here that I've seen or arguments about that – if it includes criminal and non-criminal, law-abiding and – that's not the right way to say it – law-abiding and criminal, or law-abiding and not law-abiding, then I'm not sure how that's what I'm supposed to do with that. So to clarify, those are pistol magazines that exceed the district's cap. Mm-hmm. I would look – From a literal standpoint. Correct. So I would look at it this way. Even taking the bottom of that range, 100 million, there are, at the peak – and this is cited by the Brady Brief – maybe 600, 700 mass shootings per year. Even if every single one of those are considered unlawful purposes, you're still talking about a fraction of a fraction – There's lots of other unlawful – those are horrific. They are. Horrific, but there's plenty of – I assume the flip side of your self-defense rationale is that there are people who seek to do harm to other people. And if all they had were bows and arrows, we wouldn't need this, right? So they have guns. I'm going to put words in your mouth. That was my understanding of what the self-defense rationale is, especially in your reply brief that you were talking about. So to correct – I mean, I want to make sure – I have an idea whether that statistic includes purchases or straw purchases for criminals. No, they're legitimate purchases, and that's established. They're legitimate, sold to people who are allowed to purchase these. They can go, and they can purchase these. That's what a straw purchase is, too. Really are. Even if you include and all the – so let me be very clear. The rationale that the district – not only in this case, but even the District's Committee on Public Safety gave for advancing this categorical ban was that they wanted to make sure that you could prevent people from shooting rapidly and hurting a lot of people without having to pause to reload. That's the reason why I gave the mass shooting statistic. Even if we look at all shootings, 115,000 is roughly the average over the course of one year in America. Even if every single one of those shootings included one of these higher-capacity magazines – certainly do not – that would still be roughly two one-hundredths of the number in circulation that are being used for demonstrably illicit purposes. There's nothing more that we need to show to show that these are overwhelmingly commonly used and overwhelmingly commonly used. Do you say demonstrably illicit or illicit? They are demonstrably used for illicit purposes. Oh. They are demonstrably used for – I don't know. They are plainly commonly possessed and overwhelmingly possessed by law-abiding citizens for lawful purposes. And relevant lawful purposes, self-defense? The way that Heller phrased it was lawful purposes like self-defense. That would certainly include self-defense training, which – Well, the district court in this case said self-defense was the operative one, at least, again, for purposes of the preliminary injunction statement. Correct. Everything's open on there. So Heller is focused here on self-defense for the PI. That is correct. And even in those circumstances, even if we limit the lawful purposes to self-defense, we still win on this record because I believe 64% of the people who purchased these and want to carry these have said that they want to use those for self-defense. And it makes sense given the notion that, as the district has pointed out, there is an uptick in crime. There are problems out there. These are law-abiding American citizens who want to make sure that they can effectively meet force on force if the unthinkable occurs. So that's getting towards the – This goes to the balancing of the four factors. Why did you agree to a stay? We agreed to a stay at the district court because we felt that the legal issues in this case were probably clear enough that if we brought this up on this record, the decision as a matter of law about whether or not these are covered, protected, and categorical bans were at the limit would be clear enough to the court so that it would go back down. And that's the reason why we asked for entry. A lot of confidence in us. Well, we felt confident in our position, Your Honor. And for that reason, that's the reason why we've asked not only for entry of a preliminary injunction. The distinction between the facial challenge and the as-applied challenge cuts in favor of not accepting your invitation to grant a permanent injunction period full stop in the case here. If the court is inclined to say that we want to limit this on this record to these plans before, we would certainly ask for a remand. We would ask for, you know, in the finding of the success and the merits, that as a matter of law, the Second Amendment does not prohibit, does not allow this sort of categorical ban. If additional evidence needs to be taken to satisfy this court, that the record supports that this is unconstitutional as a facial challenge, we would certainly welcome the opportunity to argue on a remand. Let me take you back to LR2 for a moment. It seems to me that we didn't answer the common use question. What reserved? I believe that the way that it was phrased was that it was a recognition that there is larger capacity magazines were common. I think the actual precise question that was reserved, it was assumed that they were used for common lawful purposes. We cannot be certain whether these weapons are commonly used or are useful specifically for self-defense or hunting, and therefore whether the prohibitions itself. Correct. So it was assumed but not decided. We need not resolve that question. So we didn't. That's true, Your Honor, but on this record also, I believe that the record is relatively indisputable. The district, I don't think, disputes that as a matter of just pure numbers, these arms are astoundingly common. I take the distinction, but insofar as you were insisting that LR2 resolved the matter, I think that's erroneous. I think that the argument was that LR2 recognized that these were common. They reserved the question fully of whether or not they were commonly used for lawful purposes. That was how I read it, obviously, Your Honor, what do you think? That is the key question. Even if they're commonly used, without commonly used for lawful purposes, it doesn't get you where you need to go. That's correct, Your Honor, and that goes back to our argument that with the numbers of these in circulation, and even taking as a given the highest number of laws that could be broken, shootings that could occur with these, these are still overwhelmingly not used for crime. These are overwhelmingly used for lawful purposes, and of those lawful purposes, overwhelmingly used for self-defense. When they are used for crime, though, they are unusually legal. I wouldn't dispute that, Your Honor. Certainly, the concern about mass shootings and the focus on being able to shoot rapidly without reloading, to the extent that we're here and only talking about plus 10 pistol magazines, to judge them at the point that we're on the as-applied level here, the ability to shoot that fast with a pistol is what I would suggest somewhat distinct from what I believe is happening with regards to mass shootings with the long-rifles. That said, though, the fact that Heller considered that 70% of mass shootings were committed with pistols and still nonetheless found that that was not a good reason that could not overcome the Second Amendment protection for pistols in that case suggests that that sort of cost-benefit analysis, that sort of being the pluses and minuses, is something the legislators should not do and the court should not engage in. And Bruin really sort of reinvigorated that. They said that we've done, pardon me, means and balancing from Heller to Bruin. And during that period of time, they realized that, pardon me, means and balancing wasn't in accord with the history and tradition test that was set out. So those types of concerns, the back and forth about whether or not these are too dangerous versus whether or not common citizens should possess them is something that Bruin took off the table. Well, unless it can be fitted into the historical. Correct, but common use means that there is no historical tradition. If there was a historical tradition of a categorical ban on these arms, they would have never come into common use for lawful purposes. That's how the common use test fits into the historical tradition. Bruin test. Just a couple more questions. First, just a fact one. How long have your clients been residents of D.C.? Years, Your Honor. I don't have the precise number before me, but they've been here for a while. When you say years, does that mean three, five, ten? I can confirm that whenever I sit back down before rebuttal. I don't have that information directly before me. I'm sorry. How long have the SFI clients here been residents of D.C.? I'll give that information for you. One thing I'm curious about is justices have said many times that banning automatic weapons would be consistent with history and tradition. Given that those did not come on the scene in any significant number, any materially significant number until the 20th century, what tradition of regulation are they talking about? In that particular instance, Your Honor, I think that that actually is an example of the government getting regulation correct. As a historical matter... When did that regulation by government start? I believe you actually look at – it was in the 1930s, and the reason why I want to make sure... The 1930s don't count. Pardon me? I thought your brief said 1930s don't count. They don't, and for purposes of this, I want to make sure that the court gets the timeline correct because even granting that they're looking at this, from the early 20th century perspective, either way, the history and tradition, the citations, need to somehow key back into the initial understanding of the American family. The reason why Tommy guns, or machine guns in particular, are different is that they hit the civilian market in 1921. Those guns, and this is actually recognized by Justice Kavanaugh's dissent in Heller 2, those guns were a commercial failure. They did not sell. They were overly and prohibitively expensive. The people who bought those were the criminals, were the mafiosos, and they were using them for perhaps, as an example, one of the most infamous mass shootings the world had seen, the St. Valentine's Day massacre. That happened in 1929. The bans that some states experimented with, which to be certain were very, very far between, were four bans, and the federal government deciding not to ban but to regulate the sale of automatic weapons happened in 1934. So that was rapidly changing technology. They can't be banned. They can only be regulated. That's our position. I'm still trying to answer my question. I understand the timing and the history, but then the language that has been used by justices has been they fit within tradition. Under Bruin, tradition means that I go back to find something at the founding that has the sort of same how and why. So what is that tradition for automatic weapons? For automatic weapons, I think that the only wiggle room for the government to categorically ban those would have to be really stretching the dramatic technological change. What tradition were the justices referring to? For purposes of automatic weapons, I'm not clear. M-16s and Heller, so maybe they're wrong? It wouldn't be consistent with history and tradition to ban automatic weapons. No, not at all, because there is some wiggle room for dramatic technological changes in the precise when they speak of them. I understand that those were, and I quote, highly unusual in society at large. So to be able to actually key that back in, I haven't litigated myself in automatic weapons case. I don't know exactly. I'm just trying to figure out how to. After Bruin, you can have a type of weapon that technologically wasn't even a twinkle in any gun owner's eye at the time of the founding or even Civil War. The technology just wasn't there, and that technology just materialized until 20th, 21st century. But everyone, the justices, I think, Heller was the majority opinion, feel pretty confident that prohibitions, or even regulations, you're going to have to make the same type of showing under Bruin, all fit with this history and tradition. And so we have arguments here, and arguments on both sides, to be clear. But arguments on one side that is sort of the semi-automatic weapons, the rapid-fire high-capacity, they have is a much more modern innovation. But yet they have to try to find, this is your argument, they have to try to find something back in time that parallels that. And so what I'm asking you is, are you aware of any back-in-time parallel that's relevant for automatic fire? I am not standing here, Your Honor. And I think that it really emphasizes also that even the categorical bans on automatic fire weapons are astoundingly, exceedingly rare. At this moment, to this day, if you're a lawyer... I'm just asking what the justices were, what history and tradition they were relying on. That part of it I don't have the answer to, Your Honor. But what I can say is, as a historical matter, automatic weapons are not categorically banned. You can get them, you can jump through a lot of hoops. They might be prohibitively expensive. The average citizen, the average law-abiding citizen can still get those. For purposes of this case, though, the one thing that we know for sure is that if something has come into common use for lawful purposes, that satisfies the Second Amendment inquiry. Because if there's not a historical tradition of banning these semi-automatic, higher-capacity magazines, that means that there is no history and tradition of making them lawful. But, in fact, as we've discussed, for purposes of our as-applied challenge, there's a range of these magazines from, shall we say, six to... Maybe it even goes less than six. Two? Is there a two or a four? I don't know. Not that I'm aware of, Your Honor. Six to 17 is what we're thinking about for this preliminary injunction. There's a range. Correct. They have not banned those. They have simply drawn a line that said... They didn't draw a line and sort of said, we think over this amount is historically allowed for us to regulate, is not common use for self-defense, fits with our tradition, and fits with the text of the Second Amendment. That's their argument, that we have to draw the line somewhere. Now, you agree that they get to draw a line. They do, and that line has to be commonly used for self-defense. They cannot carve out arms that are commonly used for self-defense. I don't know, but I'm just going here. Is this a ban, or this is what legislatures do all the time, and that is do line drawing. You're not banned on high-capacity magazines. In the district, we certainly are. No, you're not banned. You can't have ones that are more than 10. But 10 and one in the chamber are 11. That's a lot. And so the question is, it sounds like your argument is simply they had to draw... They did a line drawing, not a ban. They did a line drawing, but you think the line should have been at 17 for purposes of the PI. You can do more than that. You're likely to succeed for the status quo changing, replicably harm inflicting preliminary injunction, if they should have drawn the line at 17 and not 11. You can have 10, so 11. That's what this is about, is legislative line drawing. It is, but that legislative line drawing is still a categorical prohibition on anything that falls above the line it's drawn. And if that is a categorical prohibition, that line cannot be drawn consistent with the Second Amendment. It's not the same as a ban on handguns or intense regulation of handguns. It's not the same as a ban on semiotic weapons, semi-automatic weapons. It is, we need to allow these under the Second Amendment, and the question is how much lethality we're required to allow by the Second Amendment. The reason why common use really has to be the watchword is Heller itself, Justice Scalia's opinion, considered these types of arguments. Why do you need a pistol whenever experts say a rifle might be better for home defense? And what Heller said- Categorically different in very, very many different ways. Here we're just talking about the number of bullets. But I reiterate- We agree that there's a number of bullets that they can ban. Well, certainly those that are not in common use for lawful purposes, and that is their burden to show where that line lies. Self-defense today, this morning, for purposes of the PI. Correct. But I want to- It's as simple as that. What role in Bruin does the passage about dramatic technological change or perhaps more important, unprecedented societal concerns, what role does that play in the analysis? I think part of the role in that analysis is keyed into the idea that Heller itself dealt with a categorical ban on a class of arms. The issue in, pardon me, in Bruin, was where could you carry certain arms? So they had to go through things. For example, the issue in my case was inside versus outside. An example of a dramatic technological advancement would be, okay, do we allow the Second Amendment to protect people to carry firearms through TSA security? We certainly have similar concerns. There might be an analogous history and tradition of banning arms, and they recognize it in sensitive places. Taking Bruin, one of the four corners of the issue in that case, really sort of informs why it was that the court was so focused on dramatic technological changes, perhaps airplanes, and societal concerns, 9-11. So in those circumstances, the historical analysis becomes a little more acute. Heller, though, said that as soon as you have common use for purposes of today, self-defense... So Bruin comes after Heller. Correct, it does. But Bruin really clarifies Heller. It's supposed to clarify it. I'm not sure whether it helps me. The clarification there, and I think it really is this, is that when you're talking about categorical bans on arms, arms that are in dispute to be used for self-defense, the government cannot satisfy, based on the history and tradition test articulated in Bruin. Suppose that unprecedented social concern, societal concern, arises after something is in common use. Under that circumstance, Your Honor, the Second Amendment, as interpreted in Bruin, suggests that that is still protected under the Second Amendment. So the arising of some unprecedented societal concern just has to go unredressed or ignored if it involves something in common. Not at all, Your Honor, because the legislature has other tools. They have tools short of a categorical ban. I'm not going to prejudge. What would your argument apply just as much to regulation if they couldn't find the analog? You've got common use, unregulated, at the time they act. They can't find some 1792 law that regulated this thing that did not exist remotely properly. How are they going to do it? Well, for instance, in this case, if you're talking about... They're going to challenge the regulations, too. Pardon me, Your Honor? Both are going to challenge the regulations, too. They are, Your Honor, but I think that if I were up here and, for example, the district had said that the only people who can possess plus 10 magazines are folks who have a concealed carry license, and they've gone through the training and demonstrated, it would be a very different case. We would have a much harder challenge if you still say it fails the Bruin test. Not necessarily, Your Honor. I'm not prepared to say that. I don't think that it would because concealed carry licenses, that's something that Bruin actually recognized are longstanding. Bruin didn't throw out, for instance, the concealed carry license scheme. It actually said that for as long as it's a shall issue scheme, we're not disturbing those findings. They didn't prejudge that at all. That would be an extraordinarily harder case. So Bruin would allow the district to say only those who have concealed carry licenses through, let's just assume you're not challenging the regulatory scheme. Correct, correct. For that, of six magazines, that would be perfectly fine. Could you repeat that, Your Honor? Because the magazine would only be six, not more than 10, not 10. I'm not sure if I completely follow your question. Joe, I'm following up on yours. So you would say, if you had a case where they said concealed carry, high magazines, 10-plus magazines, are banned except for individuals who have concealed carry permits, who've been through all our safety requirements, background checks, law-abiding individuals. They're all banned, but as for those individuals, they may carry magazines up to six. Up to six or 16, Your Honor. Six. So individuals who have... The best golden individuals can only carry six-round magazines? No, Your Honor, that would not survive Second Amendment security because you're still categorically banning a wide swath of people from possessing commonly held arms for lawful purposes. That would absolutely, under our theory,  Thank you very much. Thank you. Thank you, ma'am. Thank you. Thank you. Thank you. May it please the court, Ashwin Pathak for the District of Columbia and Chief Pamela Smith. And let me start with some of the coloquies that Judge Ginsburg and Judge Millett had with my colleague about Heller 2. Because I do think Heller 2 is quite important in this case, and I agree with you, Judge Ginsburg. I think what the court did in Heller 2 is that there were basically two paragraphs that talked about common use. The first paragraph in Heller 2 talked about whether or not they were simply numerous in society. And everybody agreed in that case that, of course, large-capacity magazines are numerous in society. There are millions of them out there. And then the court went to the second paragraph, and it said basically that there wasn't enough evidence in the record to determine whether or not large-capacity magazines are in common use or used specifically for self-defense. And it said that he would have to remand for that question to be more fully fleshed out with evidence. But then, of course, the court went on to apply means and scrutiny, an analysis that has been repudiated by Bruin. And so I think it's very indicative that the court did that, and it's highly persuasive for this case that even Justice Kavanaugh, in dissent, in the footnote at the end of his opinion, he too said that he would have remanded on this question. Everybody acknowledged in that case that there were millions of large-capacity magazines in circulation but even he would have remanded this case to figure out whether or not they were actually in common use. It seems like sort of a dim view of the American public, right? This could be so popular, so common. It could be the standard magazine that comes with the quintessential self-defense gun, to quote the Supreme Court. And yet, even though it's standard for the standard gun, it might be only in common use for unlawful purposes? Well, I certainly wouldn't suggest that it's only in common use for unlawful purposes. But what I would say is that... In common use for lawful purposes? Well, I think it's in common use for all manner of reasons. Folks might like to collect them. They might like to have them. They might like to shoot them. It seems like it has to be in common use for lawful purposes when it's the standard magazine for the standard gun. Unless you think the standard American is out for unlawful things. I don't agree with that, Judge Walker, because I think it proves too much. I think there's 700,000 machine guns out there. Folks have them as collectibles. They have them because they like to shoot them. They may even have them because they subjectively think... A lot of them are owned by police departments and government, right? And many are owned by collectors and individual citizens. I don't know how many are owned by... I don't think we have that specific number in the record, but I will just say... 500 million high-capacity magazines. That's a lot of magazines. I understand that, Judge Walker, but I think it can't just be a numerosity analysis. If the court in Heller and Bruin had thought that numerosity was the beginning and end of this test, those decisions would have been very short because they're the same number of handguns out in circulation. But instead, the court went through in Bruin a two-part analysis, step one and step two of Bruin, which started with a threshold inquiry that in our view applied the common-use-for-self-defense test that is fully consistent with what this court believed was the test in Heller, too. And I point the court to 2134 of the Supreme Court reporter that Section 3 of that opinion applying the test that it had previously set out to carrying handguns where the court said in that very first paragraph that everybody agreed in that case that handguns were commonly used today for self-defense. That's the language the court used there, and we think it has to be something more than numerosity because if it's pure numerosity, that results in a circularity that is simply untenable. I don't understand how it could be the case that there are 700,000 machine guns in circulation that's more than the 200,000 stun guns that Justice Alito mentioned in Caetano. You don't know how many machine guns are in private hands. It's certainly... They have not disputed that it's hundreds of thousands. Nobody has disputed that. I can step back and tell me... I'm going to walk through what I think is the test, and then you tell me where I'm going off the rails. So I think you start by asking, is it an arm? Is it an arm in common use? Maybe even you can extend that to, is it an arm in common use for all purposes? Maybe even is it an arm in common use for self-defense? Correct. And I know you think you win already, but let's then say I think the answer to those things are yes. Then I think there's a history and tradition inquiry that says, is there a history and tradition of this regulation? And for example, one history and tradition, I think the Supreme Court may tell us in a few months, is for unusually irresponsible people, there is a history of keeping guns out of their hands. I think the history and tradition that you're relying on, these exact guns weren't in existence at the time of the founding, but you'd need not a twin, but an analog. There's arguably a history and tradition of banning unusual guns. We could add dangerous to that if you want. Dangerous and unusual guns. And so then I think that means, okay, well, we need to find a history of that and a tradition of that. History being, we need to look to the founding era, or maybe if we're in 14th Amendment and corporation world, 1868 era, but we're not here. Say, okay, do we see founding era, colonial era, bans of guns that are unusual? And if so, is there a tradition of it? Is that why, or is it kind of widespread? And let's say that I'm with you. There is a tradition, history and tradition of banning guns for the purpose of preventing gun violence. A tradition of banning guns that are unusual, dangerous and unusual. Then you still have to show that this arm in question is unusual, right? Well, I think I would have a disagreement with how you're characterizing unusual. If you're using unusual in the colloquial sense, that is, if it's numerous in society, are there a lot of that weapon, then I would disagree with that, that that's the way that this standard has to apply. And I think the problem with that is, first of all, it doesn't comport with the historical tradition. Bowie knives, I think, were quite popular and numerous at the time that they started to be regulated in the 19th century. Nevertheless, nobody thought there was any Second Amendment issue there. They weren't banned, right? They were eventually banned in a lot of jurisdictions by the end of the 19th century. I agree that some of the earlier restrictions are carry restrictions and other sort of severe regulations of those types of weapons. You mean sort of dueling? Yes, yes. No, that's right. But, you know, I think it cannot be that unusual is simply sort of a redo of the numerosity analysis. Well, it's not a redo if we're talking about something like banning unusually irresponsible people from having guns because that's a, you know, we're not talking about whether the guns are usual or not. That's a totally separate inquiry. But when the tradition that you're talking about is a tradition of banning dangerous and unusual guns, then I do think that that inquiry is going to be very similar to that first inquiry is the gun in common use. The problem with that, I think, Judge Walker, is that I point the court to the Seventh Circuit in its decision in Friedman pre-Bruin admittedly. It noted that machine guns were all too common at the time in 1934 that the National Firearms Act passed. Nevertheless, the Supreme Court told us in Heller that it would be a startling and that's a quote from the decision proposition that those types of weapons, the same is true for short barreled shotguns, that any of those types of more militaristic, offensive, high firepower types of weapons or weapons accessories couldn't be banned. I take it the Seventh Circuit said that my impression is that the machine gun was not the standard quintessential weapon of self-defense at the time it was banned, but it was actually Congress stepped in at a time when it was still pretty unusual if you weren't a mobster to have a machine. I understand that, Your Honor. I think there are two responses to that. The first is, you know, I think around that same time there were actually a number of different bans on large capacity magazines that went into effect as well. You know, we obviously quibble with our friends on the other side about which one of those count as bans or not, but I think at the very least... Which one do you think, what's your best example of not just a carry ban of a high capacity magazine, but a total possession ban of a high capacity magazine outside of D.C.? Rhode Island,    of them seem to me to be bans on large capacity magazines. Ohio and Massachusetts and Virginia are the only states that have bans on large capacity magazines. And I think that's because Virginia all had regulations of them in various ways. I saw that Rhode Island, Michigan, and Minnesota combined the magazine cap with the mode of fire. So, for example, a high capacity Winchester, like, lever action rifle, would not have been banned by those states, but they would be banned by D.C. today. I'm not sure that's right.  in the Rhode Island provision that makes it seem like it's either or, either a certain capacity or automatic feature. So I don't think there's a ban on large capacity magazines outside of D.C. I think that's quite right. A couple other examples I'd point to would be that the model code for machine guns that was circulating at that time. Those aren't statutes. And even if I give you Rhode Island, Michigan, Minnesota, didn't Bruin say three is not enough? Four is not enough? Five is not enough? Well, I think the problem here is that it would lead to really absurd consequences. It would mean that if the National Firearms Act had been passed in 1954, 20 years later, which could have been a reasonable response. You know, Congress might have thought, let's let this percolate, let's let states decide, and then make a decision. In those 20 years, if a number of machine guns, far more machine guns had circulated, which I have no doubt that they would have, suddenly plaintiffs would be coming in and saying, hey, Second Amendment now comes in. And the scope of the Second Amendment has now changed. It actually seems like a pretty decent proxy for what's dangerous and unusual. If it's dangerous and unusual, we would expect our legislatures to step in and ban them before they become dangerous and unusual. Again, I think I would just reject that type of circular argument. I think it means that it sort of puts the cart before the horse, and it incentivizes, in my view, over-regulation by governments. I mean, it basically means that governments, if they want to try to ban a particular weapon but don't know the societal consequences of it at the time that it comes on the market, governments would really be incentivized to come in and say, you know what, we're going to just ban this now because we know if we let too many of those come out, if we let more than 200,000 or 700,000 enter into circulation anywhere, in any state in any part of the country, we are going to be forever precluded from dealing with that weapon, from regulating it heavily, or banning it down the road if we find that that weapon, you know, does lead to really serious consequences, which we would say large-capacity magazines have. And I'd add... There's also a... I wonder if there's a... There's a circularity or catch-22 or whatever it is. If... If something gets out and is, for example, like the automatic guns, and used... Automatic machine guns used by criminals, is there not likely then to have a reaction? And let's say that when they come out, they're deemed to be quite dangerous in any constitutionally relevant sense, in a way that firearms otherwise, normally in civilian use are not.     to protect themselves. Nobody wants to go up against a machine or a gun or a machine gun or a machine gun or a machine gun or a machine gun or a machine gun with a six-shooter. Right? Correct. So... So, there's... The response by people is not that we only need these for self-defense because the government doesn't let them out there and the government doesn't let... Or at least enough that criminals have them. And so, it's just... I don't know how any of this allows us to make analytical questions about what the people really want for self-defense or desire or need if there's simply this endless response to someone else has something more... You know, manufacturers put out higher magazines. I need a higher magazine. Like, new iPhone comes out, I got to have a new iPhone. New magazine comes out, I got to have a new magazine. And so, the inquiry... How do we do the inquiry then about whether they're used for facilitating self-defense without it turning into an endless... Well, if criminals have them, I... You know, I should have them facilitating my self-defense, too, so that we now have automatic weapons and before-long grenade launchers in everybody's house. I totally agree, Judge Millett. I do think that there is an arms race that would develop if the only standard is what people sort of feel they need to respond to certain criminal activity. So, this is why we've put... You know, we've made the point that, in our view, the standard is essentially what is, in fact, commonly used for self-defense. And I think you can look at that in a couple different ways. You can look at it like Heller looked at handguns. What are the actual characteristics of handguns that make them useful for self-defense? They can be grabbed quickly in a self-defense situation. They can be held with one hand while you call the police. On the flip side, you can also look at how are large-capacity magazines or any firearms actually used in self-defense situations. And on this, we've put evidence in the record that has been unrebutted by plaintiffs at this sort of preliminary stage without much evidence in total that really in the average self-defense situation, two to three bullets are fired. It is rarely, if ever, that more than 10, more than 11 bullets are fired in a self-defense situation. Now obviously, these are sort of proxies for trying to determine what is in lawful use for self-defense. But we think they're objective measures of that. It cannot be that it's just a subjective test because subjectively, citizens may decide they want a machine gun for self-defense. They want a grenade launcher for self-defense. And they may really subjectively believe that that is making them safer, that having that in their home and having it at the ready is making them safer. That would sort of lead to a rudderless test that would just be whatever weapon is most popular. Everyone's talking about standard issues, standard issue, which I assume means that's what the manufacturer puts with it. Right. When did manufacturers start selling magazines over 10? With the semiautomatic handguns. My understanding is that semiautomatic handguns were not equipped with large-capacity magazines until at least the 1980s. And I don't think plaintiffs dispute that. So it is quite a recent development that semiautomatic handguns, not rifles, were sold with or generally could even take a large-capacity magazine. And you really see when that happens in the 1980s, which is very recent vintage, that that leads almost immediately to sort of what has become the modern scourge of mass shootings. And very quickly thereafter, in 1989, California imposes a large-capacity magazine ban. Right after that, in 1994, the federal government imposes a nationwide large-capacity magazine, which I might add is the 10-round number that the district uses today. That was in effect for 10 years. The moment it went out of effect, a number of states have slowly sort of adopted those bans. As mass shootings have continued to happen across the country, usually using a large-capacity magazine. I mean, that is in the vast majority of cases, maybe all of them, a large-capacity magazine is used. And the reason for that is because it has a particular capability. I would agree with, you know, the colloquy with my friend that basically it's not a ban on weapons, per se. It really is just a limitation on the total firepower that somebody has before they need to reload. So after firing 11 rounds with a 10-round magazine, a person just needs to take a few seconds and switch out the magazine, and they can fire 10 more rounds. Are there any limits on the number of handguns with 10-plus magazines that they can have? The number of magazines? The number of magazines and the number of handguns they can go with. No. There's no such restriction in the district. There is evidence here. It's in the declaration of Mr. Kleck that mass shootings with large-capacity magazines are, in fact, a very small proportion of the mass shootings. That's fair enough, Judge Ginsburg. That's contrary to what you just suggested a moment ago. Oh, sorry. What I meant to say was that all mass shootings are conducted with large-capacity magazines, or at least most of them, not that all... No, his numbers show that that's not true. Oh, all shootings where, you know, 10 or more people are killed. These are, like, situations where there's a mass casualty number are, by and large, used with large-capacity magazines. The standard definition for mass shootings is four or more fatalities, or maybe it's victims. Certainly, if those are... They were not large-capacity magazines used, but I do think that... But it's, I mean, it's not vanishingly rare, but it is certainly the unusual situation. That's... In the most recent years, 21 going back, five of 28, zero of 21, four of 31. These are outliers. I think, you know, we certainly would dispute some of those numbers. I think many of those experts... Did you have anything contrary to that in the record? Not in the record because all of their declarations came in attached to their reply brief below, so we actually didn't really have the time for... Which numbers would you dispute that Judge Ginsburg read? My understanding is that many of the really, you know, mass shootings that have happened over the last few years were that large-capacity magazines were used in those cases, but I'm not sure that that's sort of critical to our argument in the court. It makes sense if you've got a gun that's got four to six in it and there's four fatalities, but once you start, as you said, if your statistics... Or if you believe their statistics are so when there's more than 10 magazines, there's more than 10 deaths. Well, I think that's exactly right because it's much longer before a person needs to reload, and it's that moment where a person reloads that is a time when law enforcement or bystanders can come in and intervene, so that's really the purpose of this law, but I guess the basic point that I was trying to make here... You've had that in the record. Wasn't that your evidence? Yes, and I think the basic point I'm just trying to make here is that, you know, at the end of the day, this is a judgment call. The legislature is trying to draw a line, and I took my friend on the other side to essentially be saying that the legislature can draw a line somewhere. That line, you know, they obviously want that line to be higher than the line that we've drawn, but they're not suggesting that we can't ban some large-capacity magazines. They are offering a criterion, which is to say common use. That's absolutely correct, Judge Ginsburg, and we are also offering a criterion, which is common use for self-defense. Wait a minute. We also have a declaration showing that 65% or something like that of people who have large-capacity magazines acquired them for purposes of self-defense. But again, I don't think that it can be a subjective inquiry. I don't think it can just be that people feel that they want... But they don't really accept the common-use criterion. Well, I think it's common use for self-defense in an objective sense. I think the test has to be objective in looking at the real-world situations. Is a large-capacity magazine actually commonly used in self-defense situations? We say the average number of bullets fired is two. We also say that nobody needs the firepower where they can fire 11 rounds, and then all they have to do under our law is change out the magazine, which takes a few seconds. They have not put forward any coherent theory for why they need more than 11 rounds before simply having to change out the magazine in self-defense situations. And I just don't think that is consistent with the record. It sounds... I mean, your argument is sort of that this law would go from being constitutional to unconstitutional once crime gets so bad that people start shooting more than two bullets in self-defense a lot. Well, I don't think it's quite that. I think, well, first of all, two is obviously far less than 10. But in addition to that, I think we're just trying to sort of come up with proxies for trying to understand how to objectively ascertain whether a particularly lethal weapons accessory is actually useful for self-defense. What do you make of the civilian marksmanship program that I think started in the 60s? Congress, I think, through the program, the government gives away rifles with high-capacity magazines. And I think it's been distributed to something like a quarter of a million high-capacity magazines have been distributed. So it seems like that suggests not only is there not a tradition of banning high-capacity magazines, there's actually a tradition of the government providing people with high-capacity magazines. So I do think that there is some birth for governments to make different policy choices. The federal government in 1934 enacted the National Firearms Act, you know, severely restricting a whole swath of particularly dangerous weapons. If it made a different choice for a different type of weapon a little bit later, that's their prerogative. Would you agree that there is a tradition of the government providing some high-capacity magazines to people? There is some historical evidence, yes, but I think that... Are those rifles or handguns? Rifles. And your statute bans rifles, right? High-capacity magazines for rifles. Correct, though, at this preliminary... Is it the only statute in history that bans high-capacity magazines for lever-action and bolt-action rifles? I don't know the answer to that, Judge Walker. Do you know of any other statute that does? Not off the top of my head, no. And this is sort of a... Sorry, I just wanted to say, I don't think it has been applied to a lever-action rifle, as far as I'm aware, and that really hasn't come up before, so I'm not exactly sure in what ways it would apply to that, so I don't want to sort of overstep on that. We also had a record on rifle reports for the PI stage. Correct. The adopted trial. That's exactly right, and not only that, my friends on the other side have said that it is unrebutted that all of the semi-automatic handguns that they possess do accept 10-round magazines and that they have 10-round magazines. My point on the rifle is a larger point. I think the really, really 10,000-foot test that comes out of Bruin can't be an outlier, and your law seems like an outlier, right? I think I would just push back on the notion that whether or not a state is an outlier is the relevant standard, because what that would mean is that the first state to act just can't do it under the Second Amendment. It has to be that states can sort of experiment within the bounds of the Second Amendment, of course, but McDonald made very clear that all experimentation was not off the table, and some responses... That would be a pretty good argument against the way the Supreme Court has done eighth amendment analysis, right? Fair enough, Judge Walker, but I do think that the idea here is that states get to respond to local needs and local circumstances. They have some birth to make these decisions. We take this 10 number as a policy decision that is based on a history stemming back to 1994 when the federal government imposed that restriction. Firearm manufacturers then responded by creating 10-round magazines for all of the semiautomatic handguns that are in widespread circulation today, so I do think there's been a coalescing around that number. Unusual under the Eighth Amendment, the same as the Second Amendment? I thought they were different. No, they are different, Judge Millett, and we would sort of... The dangerous and unusual phrase, we really think, is a term of art. It cannot just be that unusual. It's a stand-alone numerosity requirement, as I've already discussed. That's about the three factors after likelihood of success. I know your brief says that even if you were not to prevail on likelihood of success, that we should still deny the PI based on those factors. I wonder how the harm to the district should be thought of if we... I'm not saying we will do this, but if we were to find likelihood of success for the plaintiffs and limit the PI to the four plaintiffs, it seems very unlikely the district is going to be injured by these four plaintiffs unless you have some reason to think they are, you know, perpetrators of gun violence. I agree, Judge Walker. If the court were to limit the PI to only these plaintiffs, the harm to the district would not be as significant as what we said in our brief would happen if the court enjoined the law across the board. It would be minimal, right? I think it would be minimal. The only problem with that is I'm not sure why every other plaintiff would come in immediately thereafter and it would just sort of result in this sea of litigation. And then, eventually, you would get, obviously, to a place where we think large-capacity magazines would flood into the district. And it really happened in California. I mean, the plaintiffs have put forward no contrary evidence or rebutted the fact that for the one week in California where a district court judge did enjoin their large-capacity magazine, a million large-capacity magazines flooded into California. Yeah, it sounds like that means large-capacity magazines are in pretty common use. Well, they're certainly popular, Judge Walker, but I think, you know, I've explained why... Can I ask one more? Not necessarily one more, but can I ask a history... Can I go back to the history inquiry? Do you read the Prohibition Era laws to permit you to ban every semi-automatic firearm? No, I don't. I think you have to say no because of Heller. Correct. And then, if not, why do those Prohibition Era laws permit you to ban every firearm with a magazine above 10 rounds? Well, so I think that is... That sort of goes to the burden aspect. So when you're in this world where because of dramatic technological changes, you're looking for a historic analog and not a historic twin or a dead ringer, I think in that world, you're then looking to whether or not the prohibitions from, you know, earlier eras have a similar burden on individuals' right to self-defense and were enacted for similar reasons. And the similar burden inquiry, I think, is why you can sort of distinguish those two things. In our view, really, our law allows individuals to have semi-automatic handguns with magazines, with magazines up to 11 rounds, and as many magazines as they want and as many handguns as they want. All it's saying is that when you get to the 11th round that you fired, you have to take a few seconds to change out the magazine, which I don't think affects self-defense, you know, minimally, if at all, but in an offensive situation where a person is trying to commit sort of mass murder, those few seconds can be the difference between life and death. They're the time that a police officer can come in and intervene, or a bystander. There's evidence of that happening in the real world. I think that is an eloquent way to frame the current regime. I think an alternative framing would be you didn't used to give citizens any of those rights. It took a lawsuit in the Supreme Court for them to get what you're saying you now sort of so generously give them. The reason the Supreme Court ruled against you then, 10,000-foot inquiry, you were an outlier. Look at it today, you're still an outlier. Well, I think I might push back that today we're an outlier. There are actually a number of jurisdictions that have these requirements in addition to federal. How many jurisdictions ban high-capacity magazines for all guns? I think it's 14 these days, which covers actually close to, I think, maybe 40% of the American public, but in addition, the federal government banned these from 1994 to 2004. Let's say we are an outlier on this to some extent. I don't think that what Heller said was simply look at the jurisdictions, the district is out of line with other jurisdictions, end of story. That would have been a very short position. It is much more complicated than that, and I do think when you're looking at the historic justifications, we haven't really talked about this too much and I know I'm over my time. The national ban,  Did it apply to handguns? My understanding is that it was all large-capacity magazines. I could be mistaken about that. On the dramatic technological change, I do think this is just a substantial change from anything that existed in the 19th century. Even as late as the 1870s, you had 0.2% of all firearms being able to fire multiple rounds. It wasn't until the 20th century that machine guns came on the market, and it wasn't until the 1980s that semi-automatic handguns could take large-capacity magazines and that started to proliferate into society. So I do think there's really been substantial changes here that justify this kind of regulation and that the regulation minimally affects the Second Amendment right, and we hope the Corps will affirm. I'm happy to address any others. In Hiller 2, we said, The prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves. Now, we said that in the section of the opinion that was doing the intermediate scrutiny, so that definitely would not work for the merits inquiry. But when we're at the preliminary injunction stage trying to determine irreparability of harm, does a decision by this court conclude, it was on that record, but I don't know the material differences here, that the prohibition of large-capacity magazines does not effectively disarm individuals or, more relevantly here, substantially affect their ability to defend themselves. That language is highly persuasive, I think. I don't think I can say that Hiller 2 is binding on this court. It applied means-end scrutiny at the end of the day. That's in this language. Correct. The front-end part of it probably is still binding on this court. Correct, exactly, right. And then, also for the back-end, so definitely not right for the merits, but on that record, at least, there's hardly any evidence that these magazines holding more than 10 rounds are well-suited or preferred for self-defense, and or sport, but we're only talking about self-defense here. Is the record different in this case? That they are well-suited to or preferred for self-defense? Well, on the preferred standard, as to preferred, I think that is sort of like a popularity-type test, and so I think, we certainly don't dispute that there are many of them out there, and they are popular. On the well-suited, we certainly believe that they are not well-suited to self-defense, because- Is their popularity different? So this is 2011, so that's, you know- I don't think it's- Has the popularity changed between 2011 and 2020? There are more of them, but I don't think that, as a legal, I don't think there's a legally- Well, I'm wondering what preferred meant. Yeah. I should ask him, I know. Yes, Jessica might have a better sense of what that meant. I sort of read that to be more of a popularity-type standard, but I do think that the well-suited for is sort of a good way to think about what Heller said about handguns and contrasting that with large-capacity magazines, which we think are quite ill-suited for self-defense purposes. Thank you very much. Okay, Mr. Wenger, we will give you three minutes. Sorry, I know you want to- We have other questions. No, I completely understand that, Judge Millett. So, a few points that I want to make- Before you do that, do you have an answer on how long they've been residents? Oh, I actually did not correct that. I'm so sorry about that. So, I just want to- Can someone whisper it to you? Yeah, I want to- I heard 1987. Since 1988. Since 1988. Okay, sorry, go ahead. So, going back to the start, quoting Heller, whatever the reason, the American people choose to put something in common use, whatever the reason, a categorical ban on a commonly used arm cannot withstand Second Amendment scrutiny. The Americans do get to decide what's useful. It's not a subjective test, and the objective inquiry is whether- Is it a popularity test? They say whatever- I'm really- It's not a popularity test because objectively you can look and see what it is that America decides to arm themselves with for purposes of their self-defense. How do we- This is just a fact question. I really don't know how to answer this. I get that we know handguns are used for self-defense. It's just easier for a lot of reasons. My friend on the other side even mentioned it. Accessibility, usability. How do we know that when folks are buying 10-plus magazines, that was for self-defense? That is, say they had before, they had a 10-number magazine, 10-bullet magazine, or an eight, and then now they've purchased 16. How do we know they did that to facilitate their self-defense? We've put in the record that 64% of the people who own these plus-10 magazines have bought them for the purposes of self-defense. Was there a survey that- There was a survey, Your Honor. And that survey was done when? Recently. I think it was 2021, I believe. The totals in that survey are well over 100% because people have multiple reasons. Correct, yes. They have multiple reasons to do that, but of the highest, 64% of the people who have owned this in that survey said that they own it for purposes of self-defense. And these are- They own the magazine or they own the handgun? They specifically owns the higher-capacity magazine, the ones that are manned by the district. Smaller magazines? I don't know. No weapon at all? Because the manufacturers are pushing these things out with the higher magazines so that when you go to the store, that's just sort of what's on the shelf. It's hard to understand. Respectfully, Your Honor, there's- I think it's too much factual stuff. I mean, respectfully, there are, in some jurisdictions, you can legally buy 50-round magazines. Those are not in common use for lawful purposes because the American people have decided they don't use those for common purposes. But they decided prior to the 1980s that they didn't use magazine number 10 for self-defense. No, Your Honor. As soon as they became available- But that's like the iPhone. As soon as it's available, I want the newest one. I didn't see anything in the record where your client said, or you had any evidence, that someone wasn't able to send themselves with 11 or less bullets. That, I think- So there is evidence in the record. And this is the Warner Declaration, paragraph 10. I've got the app site here. I'll pull it up in a moment. But they basically said that these, even though they're not the typical self-defense method, there's any typical self-defense incident. But they have occurred in people- Okay, go ahead. These have occurred. There is a record that these actually have occurred where people have needed more than 10 rounds. Where is that? The Warner Declaration, it is at appendix site 746, and it's paragraph 10. But is that common use? Or has it just been a few times? I want to make sure that I answered that question in the context of the Second Amendment. In the context of the Second Amendment. Limiting the rights of self-defense to the very act of pulling the trigger cuts the protections of the self-defendant basically down to 25%. Heller itself defined the term bearing arms as not only pulling a trigger, but wearing, carrying, making sure that you are prepared for whatever happens, no matter how rare. It didn't say prepared for whatever happens in the common situation based on the statistics. Where is it on page 746? Paragraph 10, I believe. Paragraph 10. Well, the average citizen defensive gun use involves no rounds fired. Where does it say? Oh, it just says there were situations where citizens fired more than 10 rounds and needed to reload their firearms. We don't have any sense of how many that is. We don't have any sense of it. No, we would concede that it's more rare than the evidence that's in there, but it does happen. And the right to bear arms is to be ready for the unusual situation. The point about most self-defense uses not involving a shot at all really emphasizes the inappropriateness of that particular study. In most self-defense circumstances, pulling out a weapon, embrandishing it will scare off somebody else. Regardless of the magazine. Regardless of the magazine. So based on that alone, if that reason tracks, you could ban all guns. You could ban all magazines because they're quote-unquote not commonly used. Is it a preliminary injunction inquiry here and irreparable harm on their right to self-defense? That's the only context in which at least I'm asking this question. Correct, yes. And their harm on self-defense is that they are not allowed to bear a weapon to be prepared for that unthinkable circumstance where they might need to use more than 17 rounds. We're pausing to reload. More than 17 rounds? I'm sorry, that was a mistake. Okay, sure. More than 10, no, no. Excuse me. More than 10 rounds because pausing to reload for even those few seconds could mean a difference between life and death. That's the decision that the Second Amendment allows them to make. And I think that the really important quote from Bruno, I should have asked you to see this, but this is along the lines of your discussion about how many shots are fired and how often that is for self-defense. But the military serves a national defense purpose even when we're not at war, right? Correct, yes. Is there an analogy there? Absolutely there is. The ability to be prepared for the rare circumstance is covered in the very definition of what it means to bear an arm. It certainly is covered by the separate protection, the ability to keep an arm. And Heller made very clear that those are two distinct protections. So limiting the inquiry to the very act of pulling a trigger basically wipes out 75% of the plain text of the Second Amendment. But insofar as we're looking at balances of hardship in the PI context, the imposition on the burden, I should say, on the Second Amendment right as you're claiming it, would seem to be quite minimal because of the rarity, because of Zipfick's point about the rarity with which a person in a defensive situation actually uses more than 11 rounds. I still think that what we're talking about when we're talking about life-and-death situations and the ability to prevent those, on the very facts of it, that risk is irreparable. And I would submit to the Court also that even on PI, this Court has held that the invasion of a protected constitutional right is itself a reparable injury. I believe that's from a Catholic church versus Cuomo. But there is, I mean, we are instructed to take account more narrowly of the burden but even more specifically under Bruin. Oh, correct. So the imposition, the actual threat to the right here, is the ability for my clients to bear an arm that they've decided is necessary for their self-defense purposes. Again, I'll emphasize, this is a right that pre-exists the Constitution. This is something that's part and parcel of being a United States citizen. Heller stands for the proposition that the American people, to Judge Walker's question, my friend on the other side, they are the ones, they are trusted to make these decisions. They have decided that these particular semi-automatic higher-capacity magazines are useful for self-defense. In the 1920s, they decided automatic weapons were not. They do make these decisions, and they make them responsibly. One thing about that that I really want to emphasize, I think that my friend on the other side is really arguing that we should defer to the judgment of the district about what is and what is not most useful. Bruin squarely foreclosed that, and I'll quote the language. While judicial deference to legislative interest balancing is understandable and elsewhere appropriate, it is not deference that the Constitution demands here. To the question that Judge Walker asked, the test itself from Heller, pardon me, from Bruin, which they reaffirmed, is when the Second Amendment's plain text covers an individual's conducts, it presumptively protects that conduct. So that means that the very first thing is if the protection is to keep and bear an arm, if you have an arm, it is presumptively protected. If the government cannot prove... If you could wrap up here, we'd actually get more than your four minutes. Certainly. If the government can't prove a history and tradition, it can't categorically ban that arm, and the fact that something is commonly used for lawful purposes means that there is no history and tradition of banning that arm. Thank you. Thank you very much. Thanks, Mr. Bennett.
judges: Millett, Walker, Ginsburg